KELLAN S. PATTERSON, SB No. 307190
info@kellanpatterson.com
**LAW OFFICE OF KELLAN PATTERSON**
2450 Venture Oaks Way, Suite 200
Sacramento, CA 95833
Tel:  916.905.7265
Fax: 916.721.2742

Kellan Patterson, Attorney for TASHAE DAVIS

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TASHAE DAVIS, as an individual<br><br>Plaintiff,<br><br>vs.<br><br>TIFFANY HARRISON, as an individual,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**1.** Defamation – Libel<br>**2.** Defamation – Libel Per Se<br>**3.** Defamation – Slander<br>**4.** Defamation – Slander Per Se<br>**5.** Intentional Infliction of Emotional Distress<br><br>**JURY TRIAL DEMANDED** |

**SUMMARY OF THE CASE**

1.      This action arises out of and relates to the wrongful conduct of TIFFANY HARRISON,

Defendant, resulting in a statutory violation of defamation and intentionally causing severe

emotional distress to TASHAE DAVIS, Plaintiff. Plaintiff alleges as follows:

**PARTIES**

2.      Plaintiff TASHAE DAVIS, hereinafter referred to as "Ms. DAVIS" or "Plaintiff", is a

law-abiding citizen who resides in Sacramento County.

3.      Defendant TIFFANY HARRISON (aka Tiffany Shabazz), hereinafter referred to as "Ms.

HARRISON" or "Defendant", is now, and at all times mentioned in this complaint, a 42-year-old

1

female adult residing in Lacey, a city in Thurston County, in the state of Washington.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a), wherein the amount in controversy in this case exceeds $75,000 and complete diversity of citizenship exists, as Plaintiff and Defendant are domiciled in different states.

5.      Venue is proper in Eastern District of California, Sacramento Division pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this claim occurred and or was aimed towards Plaintiff who was a resident of Sacramento, California.

## GENERAL ALLEGATIONS
### Relevant Facts

6.      In May 2021, DEFENDANT, Ms. TIFFANY HARRISON, began falsely accusing and slandering PLAINTIFF, Ms. TASHAE DAVIS, via text message and social media platforms including CaringBridges.com, Facebook, Instagram, GoFundMe, CashApp, Change.org, and YouTube.

7.      These posts, texts, and petitions include but are not limited to Ms. HARRISON falsely accusing Ms. DAVIS of abusing and neglecting her brother, Iman Shabazz, kidnapping and holding Iman hostage, attempted murder and eventual murder of Iman, blackmail, and Ms. DAVIS' association with sexual assault crimes based on accusations against her younger brother, Ashante Deaton.

8.      Ms. HARRISON is Iman's alleged spouse and the mother of his three children.

9.      When Ms. HARRISON began her false accusations and slander against Ms. DAVIS, Ms. HARRISON and Iman were not in a relationship and had not been together for at least three years before Iman's accident in April 2021.

10.     Ms. HARRISON petitioned for permanent conservatorship of Iman but was denied. Ms. HARRISON married Iman under her temporary conservatorship one day before the conservatorship expired.

11.     Iman is Ms. DAVIS' older brother by 10 years. Ms. DAVIS lived with Iman when she was about one or two years old until he moved out from their home about five years later. Their

2

communication and relationship continued after Iman moved away, as he still lived within the same community. Ms. DAVIS would often see Iman around the neighborhood, and he would take her out to the park and get ice cream together.

12.     Ms. DAVIS' and Iman's relationship changed when Ms. DAVIS turned 15 or 16 years old. Iman moved from their neighborhood and started seeing Ms. HARRISON romantically. At this time, Iman was living with Ms. DAVIS' eldest sister, Katonya Brittingham.

13.     Katonya wanted Iman to live with her due to his continued drug abuse. Iman lived with Katonya for a short while to stop using drugs and get better. Katonya believed that Iman and Ms. HARRISON were using drugs such as heroin, crack cocaine, and other opioids.

14.     Ms. DAVIS first met Ms. HARRISON in 2009 at Ms. DAVIS' and Iman's sister's, Lorine Haile's, residence in Sacramento, California, when Ms. DAVIS was 19 years old. During this time, Ms. DAVIS and Lorine were preparing for Ms. DAVIS' and Iman's father's funeral. Iman introduced Ms. HARRISON to Ms. DAVIS as his girlfriend. Ms. HARRISON had just given birth to their daughter, who was only a few months old.

15.     Iman never mentioned Ms. HARRISON to Ms. DAVIS. Ms. DAVIS observed that Ms. HARRISON was nice but not very talkative. However, Ms. DAVIS was excited to meet her new niece, as she had not communicated with Iman for some time. She knew he was living with Katonya during this period.

16.     After the funeral, Iman became more present in Ms. DAVIS' life. Ms. DAVIS recently moved back to Sacramento from the Bay Area. Iman and Ms. HARRISON were living together in the Sacramento region as well, with their daughter and Ms. HARRISON's 5-year-old son. Ms. HARRISON had this child with another man; this prior relationship was allegedly abusive.

17.     Ms. DAVIS would spend time with Iman and his family, often meeting for family barbeques and holiday celebrations.

18.     In February 2021, Iman suffered a stroke.

19.     Iman called Ms. DAVIS to explain his health condition. He lost his vision, specifically his peripheral vision, and needed to go to the emergency room.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

20.     During this time, Iman was living with his aunt and uncle in Richmond, California. Since he and Ms. HARRISON ended their relationship three years before his stroke, Iman was not living with her. Before living with his aunt and uncle, Iman lived with his sister Lorine for a short time in her garage, with a few of his friends, or on the streets. Ms. DAVIS does not know when Iman lived on the streets.

21.     Ms. HARRISON allegedly filed a few restraining orders against Iman due to Ms. HARRISON's allegations that Iman wanted to stalk and kill Ms. HARRISON and their kids.

22.     Ms. HARRISON also accused Iman of attempting to harm her by intentionally tampering with her car. Ms. HARRISON posted these accusations on social media.

23.     Ms. DAVIS confronted Ms. HARRISON about her accusations and asked that she remove the post. Ms. DAVIS expressed that Iman would never do any of the actions Ms. HARRISON accused him of; however, Ms. HARRISON refused to believe her.

24.     After posting the allegations, Ms. HARRISON moved her and her children out of state to her godparents' home. Ms. HARRISON and her children eventually moved into a domestic violence shelter and home in Washington state.

25.     Ms. HARRISON did not ask for Iman's consent when moving their children.

26.     Ms. HARRISON allegedly filed an action against Iman in Sacramento County Superior Court.

27.     At this time, Iman was suspected of abusing drugs and alcohol.

28.     Ms. HARRISON allegedly convinced and manipulated their children to stop interacting with Iman. Ms. HARRISON allegedly instilled fear so that their children would not want to visit or talk with Iman regularly.

29.     On April 1, 2021, Ms. DAVIS learned that Iman was hit by a car on California Highway 99 near Longview. She immediately visited the hospital Iman was located at before Lorine and Ms. HARRISON joined the following day.

30.     Due to Covid-19, only two visitors were allowed for each patient for the extent of their stay and only one visitor could visit at a time. Ms. DAVIS and Lorine took turns visiting Iman

every day.

31.     Iman's injuries were severe. He lost his leg on impact, suffered a traumatic brain injury (TBI), damaged multiple organs, and lost most of his body's normal blood supply. After multiple surgeries, he was in an induced coma and on life support. As a result of these injuries, Iman's doctors were doubtful of his survival. Lorine and Ms. DAVIS asked the medical staff to do everything they could to keep him alive.

32.     Iman remained in the hospital for 3 months.

33.     Ms. HARRISON was eventually allowed to see Iman. During her visit, Ms. HARRISON took a video of her telling Iman that Ms. DAVIS a part of a molestation ring with her younger brother. She also stated that Ms. DAVIS and her family were trying to kill him.

34.     Ms. DAVIS spoke with the hospital social worker about Ms. HARRISON's conduct and wrote a letter to advocate against her visitation. The hospital staff approved and prohibited Ms. HARRISON from visiting in person. However, the staff allowed her to make phone calls.

35.     Ms. DAVIS wanted Iman to continue his relationship with his kids and therefore wanted to come to an agreement with Ms. HARRISON. However, Ms. HARRISON called Iman and demanded that he put her on his visitor's list if he wanted to see his kids.

36.     During this time, Ms. HARRISON began to use the molestation allegations for Ms. DAVIS' younger brother, Ashante, against Ms. DAVIS and Lorine. Ms. HARRISON knew specific details of these allegations and would threaten Ms. DAVIS by spreading the details to family members and friends through social media as a means of leverage to blackmail Ms. DAVIS into allowing Ms. HARRISON to visit Iman in the hospital, in order to manipulate Iman to give her power of attorney.

37.     Ms. HARRISON's alleged motive was receiving any potential money from Iman.

38.     In June 2021, Ms. DAVIS sent a text message to Ms. HARRISON claiming that she is a liar as it pertained to the allegations against her younger brother.

39.     Ms. DAVIS and Lorine filed claims against Ms. HARRISON twice in 2021 for civil harassment and annoyance. All parties agreed to use mediation services to settle the cases.

However, even after reaching settlements, Ms. HARRISON broke all agreements.

40.     In February 2022, Ms. HARRISON was granted temporary conservatorship of Iman. After Ms. HARRISON married Iman, she took him back to her residence in Washington Iman remained in Ms. HARRISON's care until his death in October 2023.

41.     On February 6, 2022, Ms. HARRISON started an online petition to the Sacramento California Police Department through Change.org to send Ms. DAVIS to jail for allegedly abusing Iman while he was in the hospital. The petition's description claims that Ms. HARRISON was Iman's "love for 25 years" and lists multiple reasons that Ms. DAVIS should be arrested, such as "illegally removed Imans phone and SIM card so he can't call his kids", "blocked Imans children from calling or visiting the nursing home", and "tells Iman his wife is keeping his kids from him to try and brainwash Iman." The petition, titled "Imans Army", is still active with 84 signatures.

42.     Ms. HARRISON also made a post on the Sacramento Crime Watch Facebook page claiming Ms. DAVIS and Lorine mentally and physically abused Iman, kidnapped Iman and held him hostage, and tried to kill Iman. Ms. HARRISON also posted false accusations regarding Ms. DAVIS' and Lorine's association with Ashante's sexual abuse allegations.

43.     While in Ms. HARRISON's care, Iman's health rapidly declined. Iman suffered from sepsis multiple times. Ms. DAVIS was concerned about this decline, as Iman did not get sick or suffer from deadly illnesses while he recovered in the hospital, as preventative health measures prohibited this from occurring.

44.     After Ms. DAVIS found out through another family member that Iman suffered sepsis for the third time, she called Adult Protective Services (APS) on Ms. HARRISON. Ms. DAVIS' family and friends also made multiple APS reports throughout the time Iman was in Ms. HARRISON's care.

45.     In September 2022, Ms. HARRISON called and left a threatening voicemail on Ms. DAVIS' phone.  Ms. HARRISON told Ms. DAVIS: "You're only f*cking yourself if you keep calling APS, I'm going to tell you one more f*cking time, you're going to jail, no matter how

many times you call, I'm going to make sure you go to jail, stop calling APS. Don't f*cking mess with him again, I told you, don't play with Iman and let him be abused. You damn near killed your brother. Have a nice f*cked up day."

46.     Despite leaving the voicemail, Ms. HARRISON had not allowed Ms. DAVIS to talk to Iman.

47.     Ms. DAVIS told Ms. HARRISON to leave their family alone and blocked her phone number. However, Ms. HARRISON called Ms. DAVIS from a new phone number and when Ms. DAVIS answered, Iman spoke and said "Tashae". Immediately, Ms. HARRISON took the phone and said: "Yeah, b*tch, we got K.K. locked up, don't ever call APS on us again." K.K. is Ms. DAVIS' younger brother.

48.     Ms. HARRISON recorded the phone call and posted the recording online in July 2023.

49.     On March 6, 2023, Ms. HARRISON texted Ms. DAVIS a warning that Iman "asked" for his personal belongings. However, these were items that Ms. HARRISON was supposed to pick up in 2022 but did not. The only item Ms. DAVIS possessed was Iman's cell phone, which she had already sent to Ms. HARRISON.

50.     In July 2023, Ms. HARRISON's harassment of Ms. DAVIS increased. Ms. HARRISON created new social media accounts to contact Ms. DAVIS' relatives and her current and former friends stating her accusations of Ms. DAVIS' alleged abuse of Iman. In these numerous messages to these contacts, Ms. HARRISON also associated Ms. DAVIS and her husband with Ms. DAVIS' younger brother's unrelated sexual assault case. These relatives and friends have contacted Ms. DAVIS to reveal Ms. HARRISON's actions and explain that they do not want to be involved.

51.     On July 12, 2023, Ms. HARRISON texted Ms. DAVIS two messages; both messages were again from unknown phone numbers. The first message stated "Got him, I told you it was temporary" about Ms. DAVIS' younger brother and the current accusations of sexual assault against him. Ms. DAVIS messaged Ms. HARRISON to stop contacting her and to leave her alone. The second text message was lengthier and came from a different phone number; this

message included Ms. HARRISON's false claims against Ms. DAVIS, stating that Ms. DAVIS "will not get away with any of this" and alleged Ms. DAVIS was "going to let them kill him." Ms. DAVIS responded again to Ms. HARRISON to leave her alone and that she was a sick and habitual liar.

52.     On July 15, 2023, Ms. HARRISON left an angry "emoji" reaction on one of Ms. DAVIS' public Facebook posts. This is how Ms. DAVIS discovered Ms. HARRISON's new Facebook account. Ms. HARRISON used a picture of Ms. DAVIS and her siblings as her profile picture and cover photo.

53.     On July 18, 2023, Ms. HARRISON texted Ms. DAVIS, taunting her that Ms. DAVIS' cousins do not believe Ms. DAVIS' words. Ms. DAVIS messaged her back to "stop harassing [her] and lying on [her] and [her] family."

54.      Ms. DAVIS learned that on every day in July, at almost every hour, Ms. HARRISON had been posting multiple TikTok videos that included screen recordings and screenshots of Ms. DAVIS' personal social media pages, her personal pictures and videos, and any personal text messages between Ms. DAVIS and Ms. HARRISON. In these videos, Ms. HARRISON continued to accuse Ms. DAVIS of abusing Iman during his recovery after his accident. Ms. HARRISON claimed that Iman was sick and dying, that Ms. DAVIS took Iman hostage, and that Ms. DAVIS is responsible if Iman dies.

55.     These videos will also include videos of Ms. DAVIS that Ms. HARRISON recorded while Ms. DAVIS walked out of the hospital where Iman was located. Ms. DAVIS did not consent to any of the recordings Ms. HARRISON has posted.

56.     Since 2021, Ms. DAVIS has had to limit who can comment on her posts or turn off the comments section entirely due to harassment from those watching Ms. HARRISON's videos or interacting with her posts. Ms. HARRISON will encourage her followers to harass Ms. DAVIS and created a page with Ms. DAVIS's and Lorine's address specifically detailed "for those that want to comment on Tashae's videos but can't."

57.     Due to Ms. HARRISON's conduct, Ms. DAVIS and her husband feel unsafe. Not only is

Ms. HARRISON harassing Ms. DAVIS, but she is also putting Ms. DAVIS' husband and children in danger. Ms. HARRISON alleges that Mr. Davis is abusive and uses drugs and has sold drugs to children at the high school he worked at. Ms. HARRISON is also revealing their home address and the full names of Ms. DAVIS' children through her TikTok videos. Further, Ms. DAVIS is unsure whether Ms. HARRISON sent people to stalk her family, as Ms. HARRISON has threatened that she knows Ms. DAVIS and her husband's personal and daily schedules.

58.     Ms. DAVIS filed for and was granted a permanent restraining order against Ms. HARRISON in December 2023 for the maximum duration of 5 years. However, at present, Ms. HARRISON continues to defame Ms. DAVIS. On January 29, 2024, Ms. HARRISON created another Change.org petition demanding the Sacramento County Police Department reopen an investigation into Iman's case, where she claims he was a victim of "medical kidnapping". There are currently 77 out of 100 signatures, with many comments seeking justice for Iman and blaming Ms. DAVIS for his death.

### FIRST CAUSE OF ACTION
### DEFMANTION - Libel
(Brought by Plaintiff Ms. DAVIS, against Defendant)

59.     Plaintiff re-alleges and incorporates each and every paragraph above as though fully stated herein.

60.     From 2021 until the present day, Ms. HARRISON has engaged in defamatory conduct towards Ms. DAVIS by falsely assaulting her character and reputation through constant, written harassment online.

61.     Defamation, by California law, involves 1) a publication, 2) that is false, 3) that is defamatory, 4) that is unprivileged, and 5) that has natural tendency to injure or that causes special damage. *Bowles v. Constellation Brands, Inc.* (2020) 444 F.Supp.3d 1161, 1172. In California, "defamation" may occur by means of libel or slander. Cal. Civ. Code § 44.

62.     The publication must be an intentional statement of fact and must specifically refer to, or be of and concerning, the plaintiff; may be written or oral; and is a communication to some third person who understand both the defamatory meaning and its application to the defamed person.

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Bowles* at 1172.

63.     An essential element of defamation is that the publication be a false statement rather than opinion. *Id.* at 1174. This is a question of law for the courts due to the requirement that a statement must contain a provable falsehood; however, a statement of opinion may still constitute defamation if it implies false factual assertations about the defamed individual. *Id.*

64.     A privileged publication is one without malice to a person interested therein 1) by one who is also interested, or 2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or 3) who is requested by the person interested to give the information. Cal. Civ. Code § 47(c). California courts have found that this privilege applies where the communicator and the recipient have a common interest and such communication is protected by the interest. *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 949. This interest "must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business, or similar relationship, or where the defendant is protecting his or her own pecuniary interest." *Id.* The plaintiff has the burden to show that the defamatory statement was published with malice. *Bowles* at 1178. A general allegation of malice will not suffice; plaintiff must allege detailed facts showing defendant's ill will towards him. *Id.*

65.     Special damage "means all damage that plaintiff alleges and proves that he or she has suffered in respect to his or her property, business, trade, profession, or occupation, including the amounts of money the plaintiff alleges and proves her or she has expended as a result of the alleged libel, and no other." Cal. Civ. Code § 48a(d)(2). However, if a defamation claim is defamatory on its face, then it is actionable without proof of special damages. *Garcia v. City of Merced* (2008) 637 F.Supp.2d 731, 754. This is called defamation per se and exists if in addition to being defamatory on its face, the statement is also untrue. *Id.*

66.     Generally, under California law, "libel" is a written communication that is false, that is not protected by any privilege, and that exposes a person to contempt or ridicule or certain other reputational injuries. *Bryant v. Lowe's Home Centers, LLC* (2022) 628 F.Supp.3d 1036, 1042.

67.     Here, Ms. HARRISON defamed Ms. DAVIS by making online libelous statements in which she accused Ms. DAVIS of mentally and physically abusing Iman, kidnapping, blackmailing, holding hostage, attempted murder, and murder. First, Ms. HARRISON published her defamatory statements on platforms such as Facebook, Instagram, TikTok, GoFundMe, Change.org, and YouTube. Ms. HARRISON made these excessive and unsolicited publications of defamation of and concerning Ms. DAVIS to third persons. The third persons Ms. HARRISON published the defamation to include but are not limited to family and friends of Ms. DAVIS and online communities that are part of the Facebook groups Ms. HARRISON posted to, Ms. HARRISON's Instagram, TikTok, and YouTube followers, commenters and subscribers, and supporters of the GoFundMe and Change.org petitions.

68.     Moreover, Ms. HARRISON's statements are false, defamatory statements of fact. Ms. HARRISON was not stating an opinion when writing these statements online or saying these statements on her TikTok and YouTube videos, as she is actively trying to convince these third persons of the truth of her defamatory statements about Ms. DAVIS. As a result of Ms. HARRISON's statements, many of her TikTok followers and commenters believed the allegations that Ms. DAVIS abused her brother, kidnapped him, or tried to kill him. Thus, this shows that any reasonable person can interpret Ms. HARRISON's defamatory statements as stating actual facts about Ms. DAVIS. However, Ms. DAVIS did not abuse her brother, kidnap him, or try to kill him. Thus, Ms. HARRISON's statements are false.

69.     Ms. HARRISON made unprivileged statements of defamation against Ms. DAVIS because these statements were made with malicious intent. When Ms. DAVIS prevented Ms. HARRISON from visiting Iman while he recovered in the hospital, Ms. HARRISON's behavior towards Ms. DAVIS and her family turned hostile. Ms. HARRISON's hostility towards Ms. DAVIS increased when Ms. DAVIS called APS on Ms. HARRISON. Ms. HARRISON left aggressive voicemails on Ms. DAVIS' phone and when she did speak to her and often used explicit language in these phone calls. After these events, Ms. HARRISON took to posting her severe claims of Iman's alleged abuse with the intent to harass Ms. DAVIS and tarnish her

reputation. Additionally, these posts furthered Ms. HARRISON's motive to earn income through Facebook, Instagram, GoFundMe, and CashApp, under the guise that donations are needed to seek justice for Iman. As a result, Ms. HARRISON acted maliciously in posting these defamatory statements.

70.     Lastly, Ms. HARRISON's written statements are statements are that are defamatory on their face, Ms. HARRISON's direct written statements on social media and on her petitions, accusing Ms. DAVIS of blackmail, abuse, kidnapping, holding hostage, attempted murder, and murder of Iman subjected Ms. DAVIS to hatred and contempt. For example, Ms. DAVIS needed to turn off her comments section on all of her public social media pages because those who saw Ms. HARRISON's posts flooded Ms. DAVIS' pages with harassing language. Therefore, Ms. HARRISON's allegations that Ms. DAVIS is guilty of abusing her brother, Iman, and thus should be arrested injures Ms. DAVIS' reputation as an upstanding individual and ministry services, in which she uses her social media to promote.

71.     Thus, Ms. HARRISON should be held liable for defaming Ms. DAVIS through libel.

### SECOND CAUSE OF ACTION
### DEFAMANTION - Libel per se
(Brought by Plaintiff Ms. DAVIS, against Defendant)

72.     Plaintiff re-alleges and incorporates each and every paragraph above as though fully stated herein.

73.     Ms. HARRISON's defamation of Ms. DAVIS is considered libel per se as her written accusations against Ms. DAVIS on its face subject her to hatred and contempt.

74.     A statement is libelous per se if it defames the plaintiff on its face; in other words, it does not need extrinsic evidence to explain the statement's defamatory nature. Cal. Civ. Code § 45a. Material libelous per se is a false and unprivileged publication by writing which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him [or her] to be shunned or avoided, or which has a tendency to injure him in his occupation. *Washburn v. Wright* (1968) 261 Cal.App.2d 789, 797. An allegation that the plaintiff is guilty of a crime is libelous on its face. *Fashion 21 v. Coalition for Human Immigrant Rights of Los Angeles* (2004) 117 Cal.App.4th

1138, 1145.

75.     Here, Ms. HARRISON defamed Ms. DAVIS by making online libelous per se statements in which she accused Ms. DAVIS of mentally and physically abusing Iman, kidnapping, blackmailing, holding hostage, attempted murder, and murder. First, Ms. HARRISON published her defamatory statements on platforms such as Facebook, Instagram, TikTok, GoFundMe, Change.org, and YouTube. Ms. HARRISON made these excessive and unsolicited publications of defamation of and concerning Ms. DAVIS to third persons. The third persons Ms. HARRISON published the defamation to include but are not limited to family and friends of Ms. DAVIS and online communities that are part of the Facebook groups Ms. HARRISON posted to, Ms. HARRISON's Instagram, TikTok, and YouTube followers, commenters and subscribers, and supporters of the GoFundMe and Change.org petitions.

76.     Moreover, Ms. HARRISON's statements are false, defamatory statements of fact. Ms. HARRISON was not stating an opinion when writing these statements online or saying these statements on her TikTok and YouTube videos, as she is actively trying to convince these third persons of the truth of her defamatory statements about Ms. DAVIS. As a result of Ms. HARRISON's statements, many of her TikTok followers and commenters believed the allegations that Ms. DAVIS abused her brother, kidnapped him, or tried to kill him. Thus, this shows that any reasonable person can interpret Ms. HARRISON's defamatory statements as stating actual facts about Ms. DAVIS. However, Ms. DAVIS did not abuse her brother, kidnap him, or try to kill him. Thus, Ms. HARRISON's statements are false.

77.     Ms. HARRISON made unprivileged statements of defamation against Ms. DAVIS because these statements were made with malicious intent. When Ms. DAVIS prevented Ms. HARRISON from visiting Iman while he recovered in the hospital, Ms. HARRISON's behavior towards Ms. DAVIS and her family turned hostile. Ms. HARRISON's hostility towards Ms. DAVIS increased when Ms. DAVIS called APS on Ms. HARRISON. Ms. HARRISON left aggressive voicemails on Ms. DAVIS' phone and when she did speak to her and often used explicit language in these phone calls. After these events, Ms. HARRISON took to posting her

severe claims of Iman's alleged abuse with the intent to harass Ms. DAVIS and tarnish her reputation. Additionally, these posts furthered Ms. HARRISON's motive to earn income through Facebook, Instagram, GoFundMe, and CashApp, under the guise that donations are needed to seek justice for Iman. As a result, Ms. HARRISON acted maliciously in posting these defamatory statements.

78.     Lastly, Ms. HARRISON's written statements are statements are that are defamatory on their face, Ms. HARRISON's direct written statements on social media and on her petitions, accusing Ms. DAVIS of blackmail, abuse, kidnapping, holding hostage, attempted murder, and murder of Iman subjected Ms. DAVIS to hatred and contempt. For example, Ms. DAVIS needed to turn off her comments section on all of her public social media pages because those who saw Ms. HARRISON's posts flooded Ms. DAVIS' pages with harassing language. Therefore, Ms. HARRISON's allegations that Ms. DAVIS is guilty of abusing her brother, Iman, and thus should be arrested injures Ms. DAVIS' reputation as an upstanding individual and ministry services, in which she uses her social media to promote.

79.     Thus, Ms. HARRISON should be held liable for defaming Ms. DAVIS through libel per se.

**THIRD CAUSE OF ACTION**
**DEFAMATION- Slander**
(Brought by Plaintiff Ms. DAVIS, against Defendant)

80.     Plaintiff re-alleges and incorporates each and every paragraph above as though fully stated herein.

81.     Ms. HARRISON slandered Ms. DAVIS through verbal statements she made to Ms. DAVIS' friends and family, and to Ms. HARRISON's social media followers, commentors, and subscribers.

82.      "Slander" is a false and unprivileged oral communication or uttering certain other derogatory statements regarding a person. *Bryant v. Lowe's Home Centers, LLC* (2022) 628 F.Supp.3d 1036, 1042.

83.     First, Ms. HARRISON published her verbal defamatory statements through videos on

platforms such as Facebook, Instagram, TikTok, and YouTube. Ms. HARRISON made these excessive and unsolicited publications of defamation of and concerning Ms. DAVIS to third persons. The third persons Ms. HARRISON published the defamation to include but are not limited to family and friends of Ms. DAVIS and online communities that are part of the Facebook groups Ms. HARRISON posted to, Ms. HARRISON's Instagram, TikTok, and YouTube followers, commenters and subscribers.

84.     Moreover, Ms. HARRISON's statements are false, defamatory statements of fact. Ms. HARRISON was not stating an opinion when saying these statements on her TikTok and YouTube videos, as she is actively trying to convince these third persons of the truth of her defamatory statements about Ms. DAVIS. As a result of Ms. HARRISON's statements, many of her TikTok followers and commenters believed the allegations that Ms. DAVIS abused her brother, kidnapped him, or tried to kill him. Thus, this shows that any reasonable person can interpret Ms. HARRISON's defamatory statements as stating actual facts about Ms. DAVIS. However, Ms. DAVIS did not abuse her brother, kidnap him, or try to kill him. Thus, Ms. HARRISON's statements are false.

85.     Ms. HARRISON made unprivileged statements of defamation against Ms. DAVIS because these statements were made with malicious intent. When Ms. DAVIS prevented Ms. HARRISON from visiting Iman while he recovered in the hospital, Ms. HARRISON's behavior towards Ms. DAVIS and her family turned hostile. Ms. HARRISON's hostility towards Ms. DAVIS increased when Ms. DAVIS called APS on Ms. HARRISON. Ms. HARRISON left aggressive voicemails on Ms. DAVIS' phone and when she did speak to her and often used explicit language in these phone calls. After these events, Ms. HARRISON took to posting her severe claims of Iman's alleged abuse with the intent to harass Ms. DAVIS and tarnish her reputation. Additionally, these posts furthered Ms. HARRISON's motive to earn income through Facebook, Instagram, GoFundMe, and CashApp, under the guise that donations are needed to seek justice for Iman. As a result, Ms. HARRISON acted maliciously in posting these defamatory statements.

86.     Lastly, Ms. HARRISON's verbal statements that are defamatory on their face. Ms. HARRISON's made direct verbal statements to Ms. DAVIS' family and friends, and to her followers or subscribers on social media, accusing Ms. DAVIS of blackmail, abuse, kidnapping, holding hostage, attempted murder, and murder of Iman subjected Ms. DAVIS to hatred and contempt. For example, Ms. DAVIS needed to turn off her comments section on all of her public social media pages because those who saw Ms. HARRISON's posts flooded Ms. DAVIS' pages with harassing language. Therefore, Ms. HARRISON's allegations that Ms. DAVIS is guilty of abusing her brother, Iman, and thus should be arrested injures Ms. DAVIS' reputation as an upstanding individual and ministry services, in which she uses her social media to promote.

87.     Thus, Ms. HARRISON should be held liable for slandering Ms. DAVIS.

**FOURTH CAUSE OF ACTION**
**DEFAMATION - Slander per se**
(Brought by Plaintiff Ms. DAVIS, against Defendant)

88.     Plaintiff re-alleges and incorporates each and every paragraph above as though fully stated herein.

89.     Ms. HARRISON defamed Ms. DAVIS through verbal statements she made to Ms. DAVIS' friends and family, and to Ms. HARRISON's social media followers, commentors, and subscribers, that are defamatory on their face.

90.     A slander per se action is any false and privileged publication, orally uttered that 1) charges any person with crime, or with having been indicted, convicted, or punished for crime, 2) imputes in him the present existence of an infectious, contagious, or loathsome disease, 3) tends to directly injure him in respect to his [or her] office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits, or 4) imputes to him impotence or want of chastity. Cal. Civ. Code § 46.

91.     First, Ms. HARRISON published her verbal defamatory statements through videos on platforms such as Facebook, Instagram, TikTok, and YouTube. Ms. HARRISON made these

16

excessive and unsolicited publications of defamation of and concerning Ms. DAVIS to third

persons. The third persons Ms. HARRISON published the defamation to include but are not

limited to family and friends of Ms. DAVIS and online communities that are part of the Facebook

groups Ms. HARRISON posted to, Ms. HARRISON's Instagram, TikTok, and YouTube

followers, commenters and subscribers.

92.     Moreover, Ms. HARRISON's statements are false, defamatory statements of fact. Ms.

HARRISON was not stating an opinion when saying these statements on her TikTok and

YouTube videos, as she is actively trying to convince these third persons of the truth of her

defamatory statements about Ms. DAVIS. As a result of Ms. HARRISON's statements, many of

her TikTok followers and commenters believed the allegations that Ms. DAVIS abused her

brother, kidnapped him, or tried to kill him. Thus, this shows that any reasonable person can

interpret Ms. HARRISON's defamatory statements as stating actual facts about Ms. DAVIS.

However, Ms. DAVIS did not abuse her brother, kidnap him, or try to kill him. Thus, Ms.

HARRISON's statements are false.

93.     Ms. HARRISON made unprivileged statements of defamation against Ms. DAVIS

because these statements were made with malicious intent. When Ms. DAVIS prevented Ms.

HARRISON from visiting Iman while he recovered in the hospital, Ms. HARRISON's behavior

towards Ms. DAVIS and her family turned hostile. Ms. HARRISON's hostility towards Ms.

DAVIS increased when Ms. DAVIS called APS on Ms. HARRISON. Ms. HARRISON left

aggressive voicemails on Ms. DAVIS' phone and when she did speak to her and often used

explicit language in these phone calls. After these events, Ms. HARRISON took to posting her

severe claims of Iman's alleged abuse with the intent to harass Ms. DAVIS and tarnish her

reputation. Additionally, these posts furthered Ms. HARRISON's motive to earn income through

Facebook, Instagram, GoFundMe, and CashApp, under the guise that donations are needed to

seek justice for Iman. As a result, Ms. HARRISON acted maliciously in posting these defamatory

statements.

94.     Lastly, Ms. HARRISON's verbal statements are statements are that are defamatory on

their face. Ms. HARRISON's made direct verbal statements to Ms. DAVIS' family and friends, and to her followers or subscribers on social media, accusing Ms. DAVIS of blackmail, abuse, kidnapping, holding hostage, attempted murder, and murder of Iman subjected Ms. DAVIS to hatred and contempt. For example, Ms. DAVIS needed to turn off her comments section on all of her public social media pages because those who saw Ms. HARRISON's posts flooded Ms. DAVIS' pages with harassing language. Therefore, Ms. HARRISON's allegations that Ms. DAVIS is guilty of abusing her brother, Iman, and thus should be arrested injures Ms. DAVIS' reputation as an upstanding individual and ministry services, in which she uses her social media to promote.

95.    Thus, Ms. HARRISON should be held liable for defaming Ms. DAVIS through slander per se.

**FIFTH CAUSE OF ACTION**
Intentional Infliction of Emotional Distress
(Brought by Plaintiff Ms. DAVIS, against Defendant)

96.    Plaintiff re-alleges and incorporates each and every paragraph above as though fully stated herein.

97.    Since 2021, Ms. HARRISON has intentionally inflicted emotional, mental, and physical distress on Ms. DAVIS as a result of Ms. HARRISON's continuous harassment in making defamatory statements concerning Ms. DAVIS.

98.    In California, to establish a claim for intentional infliction of emotional distress, plaintiff must show that: 1) the defendant's conduct was extreme and outrageous, that is, conduct so extreme as to exceed all bounds of decency in a civilized community, with the 2) intent to cause, or with reckless disregard to the probability of causing, emotional distress, 3) as a result, the plaintiff suffered extreme or severe emotional distress. *Berry v. Frazier* (2023) 90 Cal.App.5th 1258, 1273. Moreover, "it must be conducted directed at the plaintiff, or occur in the presence of the plaintiff of whom the defendant is aware." *Id.* This requirement separates intentional infliction of emotional distress from negligent emotional distress. *Id.*

99.    Here, as a result of Ms. HARRISON's conduct in defaming Ms. DAVIS by accusing her

of abusing her brother, kidnapping and holding him hostage, and attempting to murder Iman, Ms. DAVIS suffered severe emotional distress. Ms. HARRISON's conduct in harassing Ms. DAVIS through her postings is extreme and outrageous because of how often she uploads content or makes a new post with her allegations. Instead of creating one or two posts that included defamatory statements against Ms. DAVIS, Ms. HARRISON continuously posts new content on social media every day at almost every hour. These posts not only include Ms. HARRISON's accusations, but has also revealed Ms. DAVIS' full name, her address, and where to find her on social media so that third persons can leave troublesome comments. Ms. HARRISON would also record Ms. DAVIS and use Ms. DAVIS' image and likeness without her consent. This conduct is so extreme that it exceeds all bounds of decency in a civilized community as it is harassing behavior with disregard for Ms. DAVIS' safety in her own home and on her personal and public profiles.

100.    Second, Ms. HARRISON acted recklessly with an intent to cause emotional distress to Ms. DAVIS because by continuously posting these false accusations and revealing her personal information to the public, Ms. HARRISON wanted to annoy Ms. DAVIS with actions that could jeopardize her safety. Moreover, any time that Ms. HARRISON would message or speak to Ms. DAVIS' family and friends to spread lies and false rumors about Ms. DAVIS and her family, this would be equally bothersome as it harms Ms. DAVIS' reputation. Ms. HARRISON's goal to obtain money through these donations that Ms. HARRISON claims would assist in seeking justice for Iman is a motive for the constant harassment of Ms. DAVIS. As a result of Ms. HARRISON's actions, Ms. DAVIS suffered severe emotional distress.

101.    Lastly, as a result of Ms. HARRISON's harassment and continued annoyance, Ms. DAVIS has suffered so much emotional, mental, and physical distress that she filed for and was granted a restraining order against Ms. HARRISON in December 2023. Although the restraining order was granted, Ms. HARRISON continues to create content defaming Ms. DAVIS, such as the most recent Change.org petition. Ms. DAVIS is currently grieving her brother's death, which is another emotionally distressing event that she cannot process properly due to Ms.

HARRISON's persistent posts.

102.    Therefore, Ms. HARRISON has intentionally inflicted emotional distress onto Ms. DAVIS.

**WHEREFORE,** Plaintiff prays for relief as hereinafter set forth.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

1. Compensatory damages in an amount to be proven at trial;

2. For General damages in the amount of $1,000,000.00.

3. For interest on the amount of compensatory damages;

4. For any and all penalties to the max amount as provided by law;

5. For reasonable attorney's fees pursuant to applicable law;

6. For costs of suit pursuant to applicable law;

7. For injunctive relief ordering Defendant to stop posting defamatory content about Plaintiff and using Plaintiff's name and image in the content;

8. For any other further relief that the court considers proper.

Date: February 16, 2024

Kellan Patterson, Attorney for
TASHAE DAVIS

COMPLAINT FOR DAMAGES